Good morning, Your Honors, and may it please the Court. Paul Clement for the Appellants. I'd endeavor to save four minutes for rebuttal. This case is not about Seattle's decision that the minimum wage should be increased, or even its judgment that small businesses need more time to phase in that increase. Instead, this case is about Seattle's decision to treat one class of small employers differently based on their association with a network engaged in interstate commerce. Indeed, if Seattle had simply imposed a higher minimum wage on employers, quote, associated with a network in interstate commerce, end quote, this would be an utterly blatant violation of the Commerce Clause and a straightforward case. But by imposing the same discriminatory treatment on networks affiliated with a franchise business, Seattle has not avoided discrimination under the Commerce Clause. Instead, this ordinance plainly discriminates in both effect and in purpose. Now, I think an appropriate starting point for the analysis here is the fact that Seattle's ordinance is expressly discriminatory. So unlike many Commerce Clause cases that take an absolutely neutral statute... In purpose or effect? Well, it discriminates ultimately in purpose and effect. The point I was trying to make is although it is not facially discriminatory on the basis of interstate commerce, it is facially discriminatory. So you have a number of Commerce Clause cases that are about a requirement that is completely neutral, like railroad cars can only have, you can only have 14 cars on a railroad, or you have to have a certain kind of label on an apple. And those apply to everybody across the board. Here you have a statute that does expressly discriminate. It just discriminates on a basis of affiliation with a franchise network as opposed to on the basis of affiliation with an interstate commerce network. The council seemed to base its decision on this classification that you're attacking, your client is attacking, on the ability of franchisees to have access to support and help from parent organizations and lower cost of supply and that sort of thing. What's wrong with that? Your Honor, is that the very sources of support that they were talking about were the sources of support from a national network, a national franchise network. So if you wanted to look, for example, to the statement that the mayor made when this suit was filed, he talked about an interest in trying to level the playing field between a purely local sandwich shop in Capitol Hill compared to franchisees who could derive benefits from a corporate national entity. I think it's the phrase that he used four times in that release. And with all due respect to the mayor, that's not a valid interest under the Commerce Clause. You can't take essentially the benefits that a participant in interstate commerce derives from participating in interstate commerce and have an express interest in eliminating those benefits to the benefit of local businesses. The city council had to make a decision about how to tier, ramp up to the objective of the minimum wage ordinance, and they based their judgment in part on the ability, the financial ability of franchisees. And yet you say that's wrong. You can't do that. I do say that's wrong, Your Honor, because, and I put it this way. I mean, it would be fine if they wanted to use some neutral metric of ability to pay and that applied equally to all companies. But you can't say that, well, I think companies that have a greater connection to interstate commerce have a greater ability to pay and escape scrutiny under the Commerce Clause, either under effects or under purpose. Is there anything in the ordinance itself, the description of purpose, that even mentions interstate commerce? No, Your Honor, there isn't. But what it's focused on is. So are we talking about discriminatory impact as opposed to purpose? We're talking about both because independent of what's in the face of the ordinance itself, there is extrinsic evidence that strongly supports. From statements of politicians and lobbyists and that sort of thing? That's right, which does count in the context of the purpose inquiry under the Commerce Clause. It is also supported, I should say, by the face of the statute itself because one of the things that's unusual about this statute is that it obviously distinguishes between small employers and large employers. It then considers the issue of when two employers are sufficiently linked that they should be treated as a, quote, integrated enterprise and then adopts a neutral standard for that. But then it specifically says, but that doesn't apply to franchises. Franchises are all swept into the large employer treatment as long as they have more than 500 employees nationwide. Excuse me. We've looked at cases where a ordinance treats different business arrangements differently. And, for example, in our LensCrafter case, we said those businesses are not similarly situated to the in-state businesses because it's a different business model. Explain why this isn't a similar type case where we've said it's a different business model, so not similarly situated. Well, Your Honor, I think the LensCrafter case is distinguishable because there you had essentially two kinds of businesses, opticians on the one hand and optometrists and ophthalmologists on the other. And this court pointed to things completely extrinsic of the statute at hand that showed that the state really treated the ophthalmologists and the opticians differently from the- So you'd make a factual distinction that because this is a different, factually, than in LensCrafter, the fact that it's a different business model doesn't make a difference? I think this is a much more straightforward case than LensCrafter, and I think this is more analogous on this point to, say, the Black Rock Farms case involving the winery statute in Arizona. I mean, there you had wineries above 200,000 and 500,000 in production. The court didn't say, well, they're differently situated because a 500,000-case production winery is a different animal. Here you have single market, really. I mean, you have sandwich shops that are clearly competing head-on in the same market. They are clearly similarly situated. Do we have to say that the franchisees and the non-franchisee businesses are not similarly situated or are similarly situated in order to find in your favor? Well, I think that is essentially a threshold for this court's analysis, but I think this court has said that that really just is a test of whether you are competing in the same market for the same customers. When you have something like the optometrist situation where you really have kind of different animals because the ophthalmologists are state-licensed, they have fiduciary responsibilities that the opticians don't have. Seattle couldn't say that franchisees – in fact, I think they did say franchisees are differently organized than a small business, and that was the distinction they made, and that is simply erroneous? I don't think you can do that and avoid inquiry under the Commerce Clause at the threshold question of whether you're similarly situated, and I think that would be, frankly, a very dangerous precedent. I didn't understand that. Are they similarly situated? I mean, was it reasonable to say they weren't similarly situated? I don't think they ever said in those terms that they were not similarly situated. Well, they said franchisees, as Judge Hawkins said, have networks, they're getting support, it's a different arrangement. So was that erroneous? It is not erroneous. It doesn't mean that they're not similarly situated for purposes of the Commerce Clause analysis, and I think it's very important. I mean, almost every statute or ordinance that discriminates between business classes is going to have some theory as to why that discrimination is appropriate. If you say, therefore, at the threshold they're not even similarly situated, you're going to completely circumvent any meaningful analysis under the Commerce Clause. And so I would think, for example, if you had a simple case in the LensCrafter case of a distinction between national chains of opticians and non-chain opticians, I don't think this Court would have reached the conclusion that both groups of opticians are not similarly situated. I think it would have gone on to the rest of the analysis, and I think it's the same here. And the best case for that is BlackRock, you're saying? Well, my best case for that is BlackRock. I think, you know, Judge Gould's case in the Rocky Mountain Fuels case is another one where the Court got past that threshold question. I can't actually think of any situation where the Court hasn't gotten past that threshold question when there was really only one market at issue. So the only cases that really stand for that proposition to me seem to be the case of the LensCrafter case and maybe the Exxon case. But there, in both cases, what you're trying to do is trying to isolate a single market where the discriminatory treatment is taking place. And that's obvious here. I mean, these are competing head-on for both customers at the retail level. They're also competing head-on for the labor that they're buying. How about, like, the General Motors v. Tracy where the Supreme Court said that okay to make a different rule for domestic utilities versus others, most of whom are out-of-state? Yeah, and again, there, though, there's something completely independent of the statute that's being challenged in the particular case that shows that they really are different animals. And there, the local utilities have a universal service obligation that the out-of-state utilities don't. And so to treat those like they're both apples, I think, is a mistake. And it's not just that the statute itself that's being challenged made the distinction for the first time. And here, this really is. A franchise relationship is not a different apple in some ways. Is that what you're saying? And why is that? I guess I don't understand that. Because they're competing in the same market for the same customers. Isn't that true in General Motors also? They were competing in the same market. There were just some distinctions in their business model. But the business models there came from independent factors like a universal service obligation. In Tracy, in the LensCrafters case, you had the fiduciary obligations that ophthalmologists have to their patients. There's nothing like that whatsoever, Your Honor. And I really would urge you that, I mean, you know, I really do think you would be cutting off the Commerce Clause analysis at its knees if you were to adopt that analysis in this case where there's nothing like that. For other purposes, Seattle treats a franchise business's employee count, so for sick leave ordinances and things like that, they treat franchise employees just as if they're normal employees. So a small franchise has 10 employees. You don't aggregate them for all purposes. So this statute is an anomaly. It treats two companies that are competing for the same customers in the same markets differently. And I think you need to get past that threshold analysis. And I think once you do, the discrimination here is plain. What is the burden on interstate commerce here? Well, I think the best way to think about the burden on interstate commerce is that these out-of-state companies are selling things to the in-state businesses. I mean, isn't that – so help me understand that. I didn't quite get that. Well, maybe the best way to think about this is that in the year 2017, this statute in practice will tell a local company that's deciding whether or not to set up as an independent shop or as a franchise business that they will pay the effect of $160 per week per employee fine if they affiliate with a franchise network. So what's traveling and interstate commerce, or what's the burden on interstate commerce? Is it the license that you're talking about, or what is it? No, the burden is the differential treatment of two businesses in Seattle based on their affiliation with interstate commerce. And I think in that sense it's very analogous to the Wynn case that the Supreme Court had where you were treating two Maryland taxpayers differently based on whether their income came from in-state or out-of-state. And here you're treating two local businesses differently based on whether they have an affiliation with a network in interstate commerce. One hundred percent of the franchise networks here are engaged in interstate commerce. Ninety-six percent of them involve out-of-state franchisors, and a hundred percent of them involve either out-of-state franchisors or other out-of-state franchisees that go into the employment count. So you're clearly differentially treating businesses based on their affiliation with interstate commerce. Are there any Supreme Court cases that say a regulation affecting franchisees discriminates against interstate commerce? There's not. I mean, you know, I wish there were, and eventually maybe there will be. I mean, you know, there obviously are the... It would be strong. Of course it would be. But I do have, it's always nice to have, you know, cases to cite with U.S. in them. But we do have the cases from the 11th Circuit, which I think stand for the proposition that when you discriminate against franchise businesses or what they call formula businesses in the ordinance there, but if you look at the definition it's the same thing, that you are discriminating against interstate commerce. I don't think that's an accident, Your Honor, because if you think about what allows especially a service business to operate across state lines, it is the ability to have common trademarks, common advertisements, a common menu. I mean, that's what allows somebody when they come into a town that they haven't been to before, they see a restaurant. It's something that they've seen before. It has a familiar logo. And if you go all the way back to the framing and think about why there's the commerce power and the like, I mean, the framers were clearly trying to knit together a national commercial republic. I think the trademark laws are a great example of that. You have the federal Congress empowering people to have a trademark that's so, you know, McDonald's is going to mean the same thing in Seattle that it's going to mean somewhere else. You're not going to walk into another state and there's going to be a completely different McDonald's and, you know, the arches are green here or something like that. But you might pay more for a Big Mac in Madison, Wisconsin, than you would in El Paso, Texas. I agree with that, Your Honor, as well. But I think the point is you have the federal Congress pass something like a trademark law precisely to knit together the commercial nation that we have. And for a local jurisdiction to say that we are going to treat you very disfavorably if you take advantage of a trademark, if you take advantage of joint advertising, I think that is very problematic. And I want to underscore that we're not talking about just some minor differential treatment of franchises. I mean, you know, the Arizona amicus brief I think is quite helpful in showing that the differential treatment per employee for the entire phasing period is almost $32,000. And as I alluded to earlier, with respect to the year 2017, this is going to operate as $160 per week per employee, call it a fine, call it a tax, call it a levy, on local businesses that decide to do, I think you can think about it three ways. They join a franchise network. I think that's a Commerce Clause violation. If they engage in joint advertising, I think that's a First Amendment problem. If they use a trademark, I think that's a preemption problem. And I think the problem that Seattle faces in this case is if they simply passed an ordinance that did one of those things directly, if they said, look, if you're a business and you want to engage in joint advertising with another business, you're going to pay $160 per employee per week fine. I think that's a plain First Amendment violation. I agree that would be a problem. In your remaining time, and I don't want to dominate it, I get your argument on the same sort of enterprise, the local sandwich shop versus the subway. I get that. What's your best proof of discriminatory effect, taking and keeping in mind that this comes up not on an evidentiary record, but basically affidavits with experts saying it could be this, it could be that? What's your best evidence of discriminatory impact? I think that the best evidence, Your Honor, is the fact that 96.7% of the franchises are out-of-state combined with the fact that the impact here is to the tune of— That's the interstate commerce issue. To me, discriminatory impact means that over a fixed period of time, the concrete proof will be established that this has a negative discriminatory impact on those associated with franchisees. I think it's really just the raw number. I mean, I'm happy to point you to, say, the declaration of Ms. Lyons who says that this is going to threaten her business, and that doesn't seem, if you think about her business, which is to provide in-home care. I mean, it's almost all of her costs are labor costs. She's basically got a business where they take people who can perform these services and match them up with people who need the services. I mean, this is going to debilitate her business, but I think that—so there is sort of concrete evidence, but I think the clear evidence is, you know, this is not something where there is some sort of ephemeral effect and you have to trace it through that, like, maybe Washington is going to lose market share if it can't have the labels it wants on the apples. I mean, here we know that for every employee it's going to cost $32,000. We know in 2017 it's going to be $160 per week. And so I think this is a case where the discriminatory treatment part of it, if you accept that discrimination against franchisees can have the effect of being discrimination on interstate commerce, the discriminatory impact is overwhelming. And I would only— The record would not be clearer after a trial on the merits. I don't think it would be any clearer than it is right now. The only thing I'll say before I sit down is I do think that, as in many cases, when you have clear evidence of a discriminatory effect, it's not surprising that you find some evidence of discriminatory purpose. And I think that if you take, for example, the protectionist sort of motivations of Mr. Hanauer, I mean, the only hope the city— Well, the interesting thing about him, he was on the commission, right? He was on the commission, but he was more than that because— Well, he was on the commission, and the recommendation that came out of the commission did not contain what you're complaining about. That's right, Your Honor, but he didn't go away at that point. He was integrally involved in the discrimination that emerged after the commission made its— And if you look at those— He was no longer on—the commission didn't exist anymore. Its job had been done. Sure. He clearly had a point of view and was lobbying for a point of view. I would just ask you to take a close look at the emails that are in the record from him because what they show is after the commission finishes its work— Absolutely, and if he was just a private citizen who didn't like my client, I wouldn't be bringing up his name. The reason I'm bringing up his name is that even after the commission sort of provides its recommendations, he is first emailing every member of the city council and explaining to them how they should respond to an unfavorable editorial about this very issue, and he's thanked by the president of the city council for his leadership on the issue. The other one that I think is incredibly revealing is the other email is to two members of the mayor's office, and Mr. Hanauer is explaining to them essentially how this provision got into the ordinance. So to dismiss Mr. Hanauer as some crank or some outsider, I'm sorry— Maybe not a crank, but somewhere in between a lobbyist and someone with an ax to grind, no question about it. And very much on the inside of this. And here, I don't think that—I mean, we came forward with this evidence based on basically a FOIA request. I mean, it would have been very easy to have a declaration from the mayor or the president of the city council to say, oh, this is nonsense. Hanauer had nothing to do with this. We did it ourselves. Here's how this came into the ordinance. And that evidence isn't there, and I think what that shows is the likelihood of success on the merits on that front. I want to continue to engage with you. You come to the court with a solid reputation. We appreciate you coming in today and sharing your thoughts. Thank you very much. Yes, counsel. So you can prepare if you want, although your time is used up. I'm going to give you three minutes for rebuttal. I very much appreciate that, Your Honor. Thank you. Thank you, Mr. Clement. We'll now hear from the city of Seattle. Good morning. May it please the court, I'm Greg Narver representing the city of Seattle. At council table with me today is my co-counsel, Edgar Sargent, and also Stacey Layton and Eric Brown representing the labor union, AMIKI. Ms. Layton and I will be dividing the city's time today. Although we're both prepared to answer questions on any issue, Ms. Layton is principally going to be addressing the discriminatory effects prong of the Commerce Clause, both the case law and the evidence of record on that point. I'll be addressing the other Commerce Clause issues in the case, including purpose and also the issue that Mr. Clement raised about whether this is, in fact, a facially neutral law. Time permitting, I'll also address the preliminary injunction standard, but I have a hunch time may not permit. If you don't march through each of its elements, still it would help me at least if you indicate whether there's any significance for us in the fact that this case comes to us on appeal of denial of preliminary injunction rather than a summary judgment or a trial record. I'd be happy to do that, Your Honor. I'll make sure and save at least a couple minutes to address that point. The principal reason this court should affirm is that the IFA, as I'll refer to the plaintiffs, hasn't shown that it's likely to succeed on the merits of any of their claims and in particular hasn't shown discrimination against interstate commerce. As the court's aware, there are a number of other claims in the case, but unless the court has specific questions about any of those, I'm content to go with what's in the briefs. Needless to say, we think that the district court got it exactly right on each of those claims in addition to the Commerce Clause. Okay, let's talk about purpose. What was the purpose in changing from the recommendation from the Citizens Committee that recommended? The mayor said, we need to address income inequality. Tell us what to do. And they came out with a recommendation that did not include the franchise element. Correct. I'm sorry. What was the purpose? What was the purpose in adding that? The purpose was identifying other businesses that, while on their face they may have fewer than 500 employees, nevertheless share characteristics that, to the council, indicated they had the ability to pay more sooner. The way the ordinance is structured is, if you can pay more sooner, you must. And franchises and the contemporaneous statements of the very statements that the IFA is looking at, of the mayor, of the council members, are all about the resources available to franchises. And so even though that wasn't part of the recommendation of the Advisory Commission, nevertheless the members of the council and the mayor made a policy decision that franchisees that are part of large networks, similar to the integrated enterprises that's also in the ordinance, are another example of a business with the wherewithal to pay more because of the resources that are available to franchisees, consistent with the expert testimony, unrebutted expert testimony that we put in on that point. So this is about financial wherewithal. The IFA repeatedly talks about this ordinance as if it was targeting franchises. But again, that's not what it's doing. The fundamental policy here is to raise wages based on all the reasons stated in the ordinance. Then why not do it across the board? What's that? Why not do it across the board? Well, because as the ordinance recognizes on its face, some small businesses are going to need more time because of lack of resources to accommodate to the higher wages. So, yeah, they could have just stopped $500 if you're below, $500 above. But they were looking for a way to get, the point is to get more money into the pockets of workers. And if there are businesses that fall below the $500 threshold, they nevertheless should have to pay more sooner if they can. So the argument is, as I understand it, is that the franchisees are similarly situated to the small businesses. And to the extent you're looking at the franchise element, that's impermissible under the Commerce Clause jurisprudence because that is a proxy for out-of-stateness. It's not a proxy. There's no proxy for out-of-stateness. There is, as has been conceded, not one word in the ordinance about where anything is located. It is all about ability. But as a practical matter, they say 96% of all franchises are out-of-state. So when we see the word franchise, we should say out-of-state. Right. And once you do that, you say these small businesses are identical. They're similarly situated. They're in the same market, same number of employees. The only thing that's different is this impermissible connection to out-of-state franchisors. So how do you respond to that? That's exactly what they're arguing. I have two responses. One is the question about are they, in fact, similarly situated. I know Ms. Leighton is going to address that in more detail, and certainly our argument is they are not similarly situated. These are different business structures that are regulated by separate statutes, both at the federal and state level, that apply to franchises. It's a different business structure, and that's the exact term this court used in that LensCrafters case. The other point I would make is that I think the Rocky Mountain case, and the portion of the case relating to ethanol, addresses this exact issue about what if we read between the lines and read this as a surrogate for saying out-of-state. What the majority opinion said in Rocky Mountain is that even if you do see some differential treatment based on location on the face of a regulation, before you go to strict scrutiny you can still look and see are there reasons apart from location for that differential treatment. That brings us back again to the expert opinions, unrebutted, that say absolutely there are. There are resources available. This is a different type of business arrangement where the resources of a franchisor can help a franchisee, even when there is going to be a bit of a wage disparity for a few years. I hope that addressed your question. Is there anything in the record indicating that franchisors are going to open their coffers to help their franchisees? It would not be in their interest to say that, and so no, I'm not aware of any statement by national franchisors saying not a problem. Of course, they're telling a very different story. But the evidence about the effects, the parade of horribles you've heard about what's going to happen as a result of this wage disparity, the only known is what's on the face of the ordinance. Yes, for a few years there's going to be a wage disparity, but what flows from that, and this is directly addressed by the experts we've put in, is pure speculation. Our economic expert, Professor Shane, said it's every bit as likely that the result of paying higher wages, you're going to get more motivated employees, less turnover. You're going to have employees working for the independent businesses who may want to go across the street and work for a franchisor, a franchisee, because there's more money there. What they haven't shown is sufficient evidence, either of effects of the type they're talking about, this is going to close our businesses down, or that it's actually going to have a true impact on the flow of goods and services in interstate commerce. The district court correctly found that case just hasn't been made. I'd like to talk a bit about the discriminatory purpose evidence, because that is certainly something the IFA has looked at a fair amount. I'd say it's unclear from the case law whether intent alone could ever make an otherwise valid law unconstitutional. In the Wynn case, the Supreme Court said the Commerce Clause regulates effects, not motives, and that makes sense. If you had all nine members of the city council say our intent today is to violate the Commerce Clause of the U.S. Constitution, but you had an otherwise benign law with only local effects, does that statement strike it down? No court has held that, as far as we're aware. And the best evidence, even the evidence they're relying on, again, shows that the purpose here is just one of determining ability to pay sooner rather than fitting in the pocket of small businesses that needed more time. The statement of the mayor. Franchises have resources that a small business in the Rainier Valley or a small sandwich shop on Capitol Hill don't have. Now, Mr. Clement touches on... Ah, the mayor used the phrase corporate national entity. Aha, he said national. There, we got you. Well, what's he talking about? Is Starbucks a corporate national entity? Of course it is. Resources. It's about the ability to pay. Starbucks owns their stores, don't they? Yeah, they don't use... They're not a franchise. That's right, they don't use a franchise model. What the ordinance is, in effect, saying is we view the McDonald's of the world and the Starbucks of the world both as having the capability to phase in wages on the regular schedule as opposed to needing more time. That's effectively what they're doing. The statements from the council members. Also about... You know, Council Member Sawant says she doesn't believe that franchisees are struggling small businesses. Council Member O'Brien says he thinks the franchisors are going to make adjustments. Agree or disagree with the substance? A lot of people disagree. Approve or not approve of the attitude or the tone expressed? A lot of people didn't. Those are policy judgments that the council made. Those are policy judgments that we've determined that large network franchisees are among businesses that are going to have the resources to pay more, and that's what we want to see. We want to see more money going into the pockets of the workers. This court has stated in Rocky Mountain that the best evidence of a purpose is what the lawmakers say at the time. Quoting the Supreme Court, this court said, the court will assume that the objectives articulated by the legislature are actual purposes of the statute unless the circumstances force us to conclude that they could not have been a goal of the legislation. None of the evidence here rises to that level. Let me say a couple words about Mr. Hanauer. I'm sorry, did I hear a... Oh, it's all up here. We're listening. Let me say a couple words about Mr. Hanauer, who, as you know, was one of 24 citizens in an advisory commission. The first observation is that Seattle is a city that loves its process, and there's no shortage of citizen commissions, boards, advisory groups. And as the district court observed, behind the scenes in the legislative process, and especially here, there are always going to be lobbyists, industry representatives, citizens all expressing their strong points of view, including, by the way, in this case, the franchises. They got a chance to have their say, but the council and the mayor decided to go in a different direction. So what do they say about Nick Hanauer? They say, well, he's not just anybody. He's important. Is that really going to be the constitutional test, that an email from a citizen can strike a law's effect down? A little more than a citizen. Yes, but he's a really important guy. Is that the constitutional test? No, he's on the commission. Yep, agreed. Some of the emails suggest, at least he's suggesting, that he knows how this franchise categorization got into the ordinance. Agreed. He is not just any citizen, but he is not a lawmaker, and as the district court noted, there's no evidence that the council president to whom his email, who responded and said, thank you for your leadership, basically a boilerplate response, adopted that point of view. He didn't fire back an email that said, how dare you, sir, but that can't possibly be the burden, that you've implicitly adopted the views of a constituent writing to you unless you negate it. I want to leave time for Ms. Leighton. The last thing I'll say is that I think there would be an obvious chilling effect on citizen participation if you can pluck the sentiments of a citizen and use it to strike down a law. I think the council and mayor would have to think long and hard next time before they establish a commission. Quick question. Of course. Mr. Clement says that nothing would be improved by a trial on the merits. There's no reason to go back and hash this out and have a long trial or even a short trial to determine things like purpose and especially impact. The observation I'd made, and I did want to respond to the question Judge Gould raised at the beginning. I hope that gives you a segue. Perfect. Absolutely perfect. Is that we don't see the need for that either. The IFA chose to come here on this record. They could have stayed in the district court. Trial was scheduled for next month. We could have had a ruling in the merits in a few weeks. They also didn't seek a stay pending appeal. This law went into effect in April, and people have been living under it for five months. They've chosen to put in the record they did. They, in our view, should have put in a lot more if they were really going to try and prove an effect on interstate commerce. On this record, we think affirmance is clearly mandated. Thank you, Your Honor. Good morning, Your Honors. I'll be addressing the discriminatory effects prong of the Dormant Commerce Clause analysis and explaining why for two separate and independent reasons this court should affirm the district court's conclusion that discriminatory effects were not shown. First, because franchisees that are part of large franchise networks are not similarly situated to small independent businesses. And second, because plaintiffs did not meet their burden of showing a substantial effect on interstate commerce. I'll start with a similarly situated analysis. There's no dispute here that a discriminatory effects analysis considers the disparate treatment of similarly situated entities. The district court found that franchisees were not similarly situated to small independent businesses because they have different business structures, and it explained that there were advantages to the franchisee structure. The IFA argues that franchises are similarly situated to small businesses because they are in almost the exact same position as their non-franchised competitors in all relevant respects. They compete for the same customers and provide the exact same services. Here's what the Supreme Court says about similarly situated. The test is, do they provide different products, compete in the same market, serve different customer bases, or occupy the same position in the distribution chain? So how does a small sandwich shop on Capitol Hill differ from a McDonald's franchise in the same location in terms of that test? I'm not sure which decision that test is from, Your Honor. General Motors versus Tracy? General Motors. Well, in the General Motors versus Tracy case, actually, as Judge Ikuda pointed out, the Supreme Court held that even when the gas companies were competing in the same market, when the public utilities were selling gas on the open market and they were competing with the natural gas companies, they nonetheless did not violate the Dormant Commerce Clause to treat them differently. And that is because in some cases, business structure is a relevant factor in determining whether entities are similarly situated. The optometrist case in this Court specifically says that part of the similarly situated analysis is whether there are differences in business structure, and it, in turn, relies on the Exxon case. In both the Exxon case and in the optometrist, or LensCrafters case, as it's also called, the companies were selling the same product in the same markets. In one case, they were selling eyeglasses to customers. In the other case, we were talking about gas stations. In some cases, owned by independent retailers. In other cases, owned by oil producers or refiners. But there is a difference between opticians and optometrists, isn't there? It's true that the Ninth Circuit and the optometrist case did also consider that the two types of entities had different professional obligations. But the Ninth Circuit also considered that there were differences in business structure and specifically said that, and I'll quote here, that a business entity structure is a material characteristic for purposes of determining if entities are similarly situated. I think this case is a good example of why it can be a materialist material characteristic, where a city is considering what a company is able to pay and on what schedule. The district court found that there were independent, that there were different business structures and that that difference was relevant to their ability to pay because of the advantages that franchisee status conferred. And the fact that these entities are not similarly situated in terms of their ability to pay should be enough to decide this case. But this court could also decide the case and affirm on the separate and independent ground that the plaintiffs did not show that the minimum wage ordinance would have a substantial impact on interstate commerce. And it's clear from this court's case law and from the Supreme Court's case law that that requires a showing that there will be a change in market share between in-state businesses and out-of-state businesses. In the Black Star case, this court rejected a showing that was similar to here, that a law that had a greater detrimental effect on out-of-state companies by requiring them to adhere to a burdensome distribution system was a sufficient showing of discriminatory effects because the plaintiffs in that case had not shown that the law would cause local goods to constitute a larger share and goods with an out-of-state source to constitute a smaller share of total sales in the market. So proposing counsel says, well, it's clear on its face that if you're going to put an additional cost on one category of small businesses, that's going to affect market share, that they will not be able to compete. It's a burden on competition. Your Honor, I have two responses. One is it's not clear, and in fact the district court found that there was no credible evidence that this would cause franchisees to close, to lose businesses, not to open new franchisee locations, and that is because there is a series of inferences. First, that actually the franchisees will be paying higher wages than their competitors, that the competitors won't have to similarly increase their wages in order to compete for workers who could earn more across the street. Then that the higher wage that they won't be able to make up for it in terms of reduced costs of turnover, for example, or cutting other costs, and so they'll have to pass the costs on to their customers. And then the customers will actually choose not to patronize the franchisees and will choose to patronize another entity. So there are a series of inferences that are required in order to show that the franchisees will be harmed at all. But then even beyond that, under Blackstar and under the Exxon decision, particularly Note 16 of the Exxon decision, it is their burden to show not only that franchisees will lose business, but that the business that franchisees lose will go to in-state independent operations rather than, for example, to their corporate-owned competitors. If a franchisee coffee shop loses business, customers may go to the small independent coffee shop across the street or they may go to the Starbucks across the way. And that would not be a change in market share between out-of-state companies and in-state companies. Counsel, if I could ask you a question, please. Does the idea that the franchisees are better able to respond quickly with higher wages during the transition period, does that depend on the premise that the franchisor will open up its resources in some way for the franchisee? No, Your Honor, it does not. There was substantial evidence in the record that there are inherent advantages to franchisee status or advantages that characterize almost all franchisee relationships. Those are found in the expert declarations that the district court credited that include common advertising and recognition, that include assistance with loans, that include purchasing power that larger entities have that franchisees can join in with. Those do not require the franchisors to do anything different. But there is also no dispute that franchisors have the authority and the discretion to step in, and that in other instances they have supported their franchisees that were facing difficult economic situations and that they could do that in this case. But it does not depend on a conclusion that they will. Thank you. I would just close with a reference to the pharma case from this court where I think there was a useful analogy. Judge Ikuda asked the question whether we should read the ordinance to say interstate where it says franchises. But the pharma case from this court, and actually the pharma case in the Supreme Court, provided a similar analysis. It asked whether a company could evade the burden that was imposed by a law by relocating to be in-state. In this case, even if most of the franchisees or all of the franchisees are affiliated with interstate networks or with out-of-state franchisors, they could not evade the obligation to have all of the employees at the franchise network counted by relocating to being an entirely intrastate franchise network. The ordinance talks about franchise status. It does not make any reference to interstate obligations. And in the pharma case, this court held that a statute that treats all private companies exactly the same does not discriminate against interstate commerce. This is so even when only out-of-state businesses are burdened because there are no comparable in-state businesses. So on that, I would, unless Your Honors have further questions, I would close. Thank you. Okay, thank you. Mr. Clement. Thank you, Your Honors. Just a few points in rebuttal. First of all, when asked what is really going on here, what's the real purpose, the city's lawyer says what we're trying to get at is financial wherewithal. I think that is a very helpful answer for our side of this case because one of the things that you look at when you're looking for purpose evidence, first you look at the kind of actual evidence we have, like from Mr. Hanauer, but then you also look for a complete absence of fit between the stated justification and what's really going on here. And if they were looking for financial wherewithal, there are 100 different ways to measure that directly that are much more responsive to that point than just simply using as a proxy affiliation with the franchise network. There are some local franchisees that are operating on a knife's edge and have very little margin to pay these wages. There are some local businesses that are doing very well and can pay small businesses that can pay this. And so you can just look at the accounting statements of the various companies or look at how much they paid in income tax as a corporate entity the year before, and you can determine which of these companies have the wherewithal to pay and which don't. Connection to a franchise network is a terrible proxy for that. Now, my friends on the other side say, well, but franchises have inherent advantages like trademarks and joint advertisements. Well, first of all, I think it's a problem when the advantages that they're pointing to are things that are constitutionally protected or raise supremacy clause problems. But the other thing the other side always forgets about in this case is those advantages come at a cost. Those aren't just gifts that franchise businesses have that don't have a corresponding cost. They pay rents to the franchisor. And in some of those cases, they may be getting a good deal. In some of those cases, they may be getting a bad deal. And that's why you have some franchisees who can afford to pay this and some who very much can't. That's what they should have been looking at if they were concerned about financial wherewithal, but they looked in the wrong place. And the only way this works then, the only way this works is if those payments to the franchisor are renegotiated. And that's what some of the council members said directly. They said, hey, you have more ability to pay this because you can always go to corporate headquarters, 96% of which are out-of-state, and renegotiate your rent. Well, that kind of naked effort to affect out-of-state commerce is an independent commerce clause problem. So that can't be what saves them or provides some sort of neutral justification. Can they rely upon a reason that may not be accurate? I don't think they can, especially when that reason is at the heartland of the concerns of the commerce clause. We don't expect every member of the city council to have a Ph.D. in economics from the University of Chicago. So if they say business structure, they have these advantages based on business structure,  But I don't... Is that discrimination? Well, I don't think that's this case. I don't think they said business structure. I think they said things like corporate national headquarters, corporate national entity, and those... I mean, I just don't think... It might be rational to say that businesses that are engaged in interstate commerce are on balance sort of better able to pay, so we're going to counteract that. I think that would be an obvious commerce clause problem because that's not the kind of benefit that you can counteract. And I think that's what you have in this case. I would just close by saying that I would encourage you to take a look at those Hanauer emails. They just can't distance themselves from him or say he's an ordinary citizen. If you look at the excerpts of records, page 67 and 68, excerpt of record 51, those are not the kind of emails that you normally have with government officials where the outsider is telling the insider how something got into the bill or the outsider is telling the insider here's how you respond to this criticism and they're thanked for their leadership on the issue. I would just close by saying on the record here... I mean, I'm happy to go for a trial if we have a preliminary injunction in place, but the record here seems to me to support exactly what you're supposed to look for at this stage of the case, which is likelihood of success. I'm sorry? You didn't ask for a stay. Well, we just asked for a preliminary injunction from a district court. We briefed the whole thing. We got a hearing before the district court and we lost. Now, in that situation, when you've just asked for a PI, when you're asking for a stay pending appeal, you're not really asking just for a stay. You're asking essentially for an injunction pending appeal and you're asking on sort of very motions panel briefing to overturn the district court's decision. Now, in a number of cases, including this one, I generally tell my clients that's a losing bet. You want to go up there and you want to brief it fully on the merits and have the real chance to influence them to come out differently. And the thing that really makes that, I think, a particularly prudent judgment here, if I do say so myself, is that the differential in 2015 is a livable differential. It's a dollar. But it's 2016 when it's $2.50 an hour and in 2017 when it's $4.00 an hour. So we made a calculated judgment that we could get a decision from this court before the real discriminatory differential kicked in. So with the court's indulgence for allowing me to go over a few minutes, I appreciate it. Thank you. Thank you. We appreciate the excellent argument on both sides of this case. It's a challenging case. We appreciate your help. The case of Seattle of International Franchise Association v. City of Seattle shall be submitted. And the court will adjourn until tomorrow.
judges: Hawkins, Gould, Ikuta